In the Matter of STEWART PARK AND RESERVE COALITION et al., Respondents, v NEW YORK STATE DEPARTMENT OF TRANS-PORTATION, Appellant.

Third Department, April 26, 1990

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Michael J. Moore, Peter H. Schiff* and *Douglas H. Ward* of counsel), for appellant.

*Elder & Long (Michael S. Elder* of counsel), for respondents.

*Beveridge & Diamond, P. C. (Henry L. Diamond* and *Christopher W. Mahoney* of counsel), for Palisades Interstate Park Commission, *amicus curiae.*

## OPINION OF THE COURT

LEVINE, J.

In this proceeding, Supreme Court found legally insufficient under the State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA) and the implementing regulations of the Department of Environmental Conservation (hereinafter DEC) (6 NYCRR part 617) a determination by respondent, the Department of Transportation (hereinafter DOT), that certain proposed capital improvements to be made at Stewart International Airport in Orange County would have no significant effect on the environment (hereinafter referred to as the negative declaration). Stewart Airport had been a major United States Air Force air-defense base until 1969, when it was declared surplus and acquired by the Metropolitan Transit Authority (hereinafter MTA) on behalf of the State. In 1971, legislation was passed authorizing MTA's construction, expansion, rehabilitation and operation of Stewart, including the power to acquire real property for those purposes (L 1971, ch 472, § 1). At that time, it was anticipated that Stewart Airport would eventually become the fourth major airport serving the New York City metropolitan area. Consistent with

that goal, 8,000 acres of adjoining land were acquired by eminent domain, to serve primarily as a noise buffer area (hereinafter the buffer area), which could also accommodate airport-compatible development. Six thousand acres of the buffer area are now devoted to a wildlife habitat for hunting, fishing and other outdoor activities. This property is managed by DEC under an agreement with DOT.

A master plan for Stewart Airport was also formulated in 1971, envisaging its development as a major passenger and cargo airport. The plan included proposals for substantial extension of the main runway, a new parallel runway and a new passenger terminal. The runway extension was seen as necessary to attract regularly scheduled airline passenger service. Subsequent to 1971, it was determined that Stewart would more appropriately be used as a major regional airport serving the mid-Hudson Valley. This still required extension of the main runway and a concrete proposal to that end was formulated. The project was reviewed in 1977 for its environmental effects pursuant to the Federal National Environmental Policy Act (42 USC § 4321 *et seq.)* (hereinafter NEPA). Hearings were held and an extensive environmental impact statement (hereinafter the 1977 EIS) was prepared by the Federal Aviation Administration (hereinafter FAA) and the MTA. The runway extension was completed in 1980.

In 1982, jurisdiction over Stewart Airport was transferred to DOT (L 1982, ch 370, § 5). An updated master plan for Stewart was prepared in 1984, incorporating the concept of Stewart as a regional air carrier airport. Various projects were proposed consistent with that plan, including development of the northwest corner of the airport for an industrial park, a major United States Postal Service facility and a large cargo facility with airside ramp and aircraft parking spaces. These actions were made the subject of environmental review including preparation of an EIS. The constructions for these projects are now in various stages of partial completion. Additionally, in 1985, the New York Air National Guard proposed the construction of a permanent facility to house 12 jumbo Lockheed C-5A planes and other military aircraft. The environmental effect of this base facility and its operations was assessed pursuant to NEPA and a negative declaration was issued.

The action at issue here was described by DOT in its full environment assessment form (hereinafter EA), as "[s]ite improvements required for scheduled air service at Stewart International Airport", consisting of (1) rehabilitation of the

existing passenger terminal, (2) expansion of that terminal by some 4,000 square feet to provide a baggage handling area, (3) construction of a circulation road near the terminal and improvement of the airport's main access road, and (4) construction of a 1,292-unit parking lot. As lead agency, DOT retained a consulting firm to study the environmental effects of the project and then adopted the firm's environmental assessment and vehicular traffic and automotive emissions study as its EA. Based thereon, DOT issued a negative declaration of environmental significance.

Petitioners then brought this proceeding under CPLR article 78 to challenge the determination of DOT "in approving the expansion and rehabilitation of the airport terminal and related facilities to support increased airline passenger service at the Stewart International Airport", alleging that DOT's negative declaration violated SEQRA and its regulations. The petition essentially alleges three defects in DOT's negative declaration: (1) its inadequacy as being wholly conclusory, (2) its failure to consider the cumulative environmental effects of DOT's plans for airport-compatible commercial and industrial development in the buffer area, and (3) its omission of consideration of the environmental effects of additional air traffic at Stewart which the proposed capital improvements are intended to serve.

Supreme Court ruled in favor of petitioners. The court held that the proposed actions covered by the negative declaration are "part of an overall plan by [DOT] to permit regular airline passenger service at Stewart International Airport and the cumulative effect of such overall plan should have been considered". The court also held that the negative declaration was conclusory and without sufficient factual support to overcome the presumption that, as a Type I action under the regulations, an EIS was required. The court annulled the negative declaration, enjoined further construction on the project pending further SEQRA review and remitted the matter to DOT with direction to consider the cumulative effects of the proposed action and any other actions "which are included in any long range comprehensive plan of which the actions under consideration are a part". This appeal by DOT ensued.

■ There should be a reversal. First, we disagree with Supreme Court's conclusion that the negative declaration is conclusory and lacks sufficient factual support to show that DOT identified all relevant areas of environmental concern,

took a "hard look" at those areas and made a reasoned elaboration of the bases for its findings of no significant environmental effect *(see, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 363-364; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417). The negative declaration expressly incorporates by reference the EA and annexed traffic and automotive emissions study prepared by DOT's consultants. These documents, in our view, identify the areas of environmental concern in connection with this limited project of expanding the passenger terminal, improving passenger access to it and adding parking in the terminal area. Notably, these documents reveal that, after restudy, the introduction of scheduled airline passenger service would not affect noise, air pollution and vehicular traffic levels more now than had been anticipated in the prior environmental studies. A lead agency such as DOT here may rely upon the advice it receives from others, including consultants, if reliance is reasonable *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 427), and there is nothing in the record which would put in doubt the reliability of DOT's consultants in this case. Moreover, an EA and comprehensive engineering report may demonstrate the sufficiency of a lead agency's examination, analysis and conclusion regarding the environmental effect of a proposed action *(Matter of Soule v Town of Colonie,* 95 AD2d 979, 981). Concededly, the project is a Type I action under the DEC SEQRA regulations (6 NYCRR 617.12 [b] [6]). However, the project was actually processed under DOT's SEQRA regulations in the same manner as a Type I action *(see,* 17 NYCRR 15.1 [c] [2]). As we have already concluded, DOT's negative declaration had a rational basis as to the specific actions referred to therein. It was, thus, sufficient to overcome any presumption favoring the need for an EIS in a Type I action *(Matter of Jaffee v RCI Corp.,* 119 AD2d 854, 855, *lv denied* 68 NY2d 607).

■ We are likewise in disagreement with Supreme Court's ruling that DOT was obligated to consider the over-all cumulative effect of its plan to introduce regular airline service at Stewart Airport merely because the capital improvements involved here facilitate such service. Indisputably, the use of Stewart Airport for regularly scheduled airline passenger service has been contemplated and reviewed for its environmental effects since 1972. The 1977 EIS for the extension of the airport runway and other improvements, with a total estimated cost of over $16 million, expressly based the need

for the project on Stewart's anticipated role as a major regional airport facility for both domestic and international scheduled airline service. Indeed, the 1977 EIS based its environmental analysis on a "worst case" scenario of annual aviation activity at Stewart of 60,000 passenger and training flights, serving more than four million passengers. The 1977 EIS also forecast the eventual need for an expansion of existing or creation of new terminal facilities, similar to that proposed in the instant project.

Although both petitioners and the *amicus curiae* are critical of the 1977 EIS in several specific respects, no party has contended that the 1977 EIS did not meet the procedural and substantive requirements of SEQRA. In any event, the record is absolutely clear that, pursuant to the 1977 EIS, capital improvements worth millions of dollars have been completed at Stewart Airport, all for the purpose of transforming it into a regional airport with facilities sufficient to attract and provide service for regularly scheduled airline flights. The very same cumulative environmental effects of bringing regularly scheduled airline service to Stewart which DOT is required to review upon remittal under Supreme Court's judgment were problems readily apparent when the runway extension and related improvements were proposed and then actually addressed in the 1977 EIS. Those improvements were completed by 1980 and have long since been time barred from further SEQRA review. In *Matter of E.F.S. Ventures Corp. v Foster* (71 NY2d 359), the Court of Appeals held that, once substantial construction on a project had been completed and is beyond SEQRA challenge, SEQRA review of later additions or modifications involving the same project cannot be used "as a pretext for the correction of perceived problems which existed and should have been addressed earlier in the environmental review process" *(supra,* at 373). So too here, DOT should not now be required to reexamine environmental problems arising from the plan to introduce regularly scheduled airline service at Stewart, all of which existed, were recognized and were addressed in the 1977 implementation of the same plan.

The *amicus curiae* brief argues, however, that the staleness of the 1977 EIS data requires full reexamination of the environmental effects of the introduction of scheduled airline service at Stewart through a supplemental environmental impact statement (hereinafter SEIS). Generally, however, the mere passage of time does not warrant reopening of environ-

mental review *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 425)*, and neither petitioners nor the *amicus curiae* have set forth anything more than conclusory allegations that changes in conditions have occurred requiring a comprehensive fresh look at the basic decision to use Stewart as a full service regional airport. Moreover, the capital improvements under review here were either explicitly or at least inferably anticipated in the 1977 EIS, and, as previously noted, the noise, air pollution and traffic effects of expanded passenger service were reexamined and found not to be significantly different from that which was anticipated in earlier studies. For all these reasons, it was not an abuse of discretion for DOT to decide not to issue an SEIS after reasonably concluding that the modifications and additions proposed herein were not environmentally significant *(see, Matter of Jackson v New York State Urban Dev. Corp., supra,* at 429-430).

Finally to be considered is Supreme Court's direction to DOT upon remittal to consider the cumulative effects of the proposed action and any other actions which form part of the same long-range comprehensive plan. Although not stated explicitly, most notable of any such potentially related actions and virtually exclusively relied upon as such in the petition is the development of some 2,000 acres of the 8,000-acre noise buffer area for aviation-related or compatible industrial and commercial development. Development of a portion of the buffer area has been in the active planning stage since 1985, as a joint project of the FAA and DOT. As colead agencies, the FAA and DOT have made a finding that the project may have a significant effect upon the environment and, therefore, an EIS under NEPA is necessary. A comprehensive, multiState/Federal agency environmental analysis is taking place, estimated to eventually cost a total of $2.5 million by completion.

The DEC regulations as to what proposed actions must be considered jointly for their cumulative environmental effects are applicable here *(Matter of Village of Westbury v Department of Transp.,* 75 NY2d 62, 71-72). Under the regulations, the cumulative effects of proposed development in the buffer zone would have to be considered in this proceeding if it were "included in any long-range plan of which the [present] action * * * is a part", or "likely to be undertaken as a result thereof" or "dependent thereon" (6 NYCRR 617.11 [b] [1], [2], [3]). Several purposes underlying the mandatory grouping of multiple actions for environmental consideration have been

put forth. First, where there is really but one plan for the development of a *single* area of special environmental significance, the accurate ecological/social/economic balancing of costs and benefits mandated under SEQRA requires that the cumulative effects of *all* actions within the plan for that area be weighed *(see, Matter of Save the Pine Bush v City of Albany,* 70 NY2d 193, 206). The second reason is that grouping the effects of related sequential actions avoids distortions in the balancing process if they were considered in separate succession when the decision in the earlier action may be "practically determinative" of the subsequent action *(Matter of Tri-County Taxpayers Assn. v Town Bd.,* 55 NY2d 41, 46; *see, Matter of Kirk-Astor Dr. Neighborhood Assn. v Town Bd.,* 106 AD2d 868, 869, *appeal dismissed* 66 NY2d 896). Lastly, considering the cumulative effects of related actions insures against strategems to avoid the required environmental review by breaking up a proposed development into component parts which, individually, do not have sufficient environmental significance *(Matter of Sutton v Board of Trustees,* 122 AD2d 506, 508-509).

■ In determining whether the relationship between the capital improvements to the airport itself under review here and the development of a portion of the buffer area meet the criteria for consideration of cumulative effects under the regulations, we stress again that petitioners may not use the present environmental proceeding as a pretext to force the reopening and reweighing of the environmental effects of making Stewart a functioning regional airport for scheduled airline service *(see, Matter of E.F.S. Venture Corp. v Foster, supra).* This diminishes the significance of any inclusion of the airport capital improvements proposed herein and the commercial development of part of the buffer area in the same over-all plan for making Stewart Airport a regional facility for scheduled airline service. Being part of the same over-all master plan for Stewart is not in and of itself conclusive. "We do not suggest that the cumulative effects of all tentative plans for an area must be measured fully in every case" *(Matter of Village of Westbury v Department of Transp., supra,* at 70-71). Other than being in the same over-all master plan, any relationship between the capital improvements to the airport proper and buffer area development is quite attenuated. The objectives of the two sets of actions and the problems they address are different *(see, supra,* at 71). The buffer area, three fourths of which is a wildlife habitat, is by itself

an area of special environmental significance *(see, Matter of Save the Pine Bush v City of Albany, supra,* at 206). The environmental concerns attendant to buffer area development are quantitatively and qualitatively different from those involved in the proposed airport capital improvements. Expansion of the airport terminal and parking area and the other proposed improvements at the Stewart facility itself will not be determinative of the extent, if any, of exploitation of the buffer area for airport-related commercial and industrial development. Therefore, it was rational for DOT to defer cumulative impact analysis to the comprehensive environmental review of proposals for buffer area development in the proceedings by the FAA and DOT now in progress.

█ We also reject the necessity for remittal to DOT for consideration in the instant proceeding of the cumulative effects of various proposals for additional airport improvements described in a letter from the FAA to DOT several months after the issuance of the EA and negative declaration herein. The proposals were part of a document entitled "Interim ALP [airport layout plan] Master Plan Studies". The actions contained in the letter were not referred to in the petition herein, or in any amendment thereto. The record is unclear on the extent to which the projects described in the airport layout plan have gone beyond the stage of tentative, long-term proposals for further study to that of specific action plans. The FAA ruled that the items were not "ripe for decision" at the time the capital improvements involved herein were under environmental review and determined that all of the developments contained in the new airport layout plan should be made a part of the environmental review in the EIS for the buffer area development. Again, we find this a rational approach *(see, Matter of Village of Westbury v Department of Transp., supra,* at 70-71; *Matter of Programming & Sys. v New York State Urban Dev. Corp.,* 61 NY2d 738, 739).

MAHONEY, P. J., WEISS, MIKOLL and YESAWICH, JR., JJ., concur.

Judgment reversed, on the law, with costs, determination confirmed and petition dismissed.