In the Matter of the Application of the **LUDLOW PARK HOMEOWNERS AS-SOCIATION, Henry Spallone as Mayor of the City of Yonkers, and G. Oliver Koppell, as Assemblyman for the 80th Assembly District, Petitioners,**

v.

The **COUNTY OF WESTCHESTER and The Westchester County Board of Legislators, Respondents,**

**for an order pursuant to CPLR Article 78 reversing and annulling the determination of the respondents to the effect that an environmental impact statement regarding the construction of a sludge dewatering facility at the Yonkers sewage treatment plant is not to be required.**

No. 90 Civ. 2543 (WK).

United States District Court, S.D. New York.

July 19, 1990.

J. Owen Zurhellon, III, New York City, for petitioners.

Susan B. Owens, Asst. County Atty., White Plains, N.Y., for respondents.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Petitioners the Ludlow Park Homeowners Association, Henry Spallone and G. Oliver Koppell seek a judgment pursuant to C.P.L.R. Article 78 and the State Environmental Quality Review Act ("SEQRA") reversing a determination by respondents the County of Westchester and the Westchester County Board of Legislators. For reasons which follow, we deny the petition.

## BACKGROUND

The Ocean Dumping Ban Act of 1988 forbids ocean dumping of sewage sludge after December 31, 1991. In 1989, the United States and the State of New York brought suit against the County of Westchester and the Westchester County Department of Environmental Facilities, seeking to ensure that the County would comply with that statute. The action was resolved by a consent decree [1] establishing a timetable for the County's development of alternative means for disposing of its waste in accordance with the law.

The Yonkers Joint Wastewater Treatment Plant (hereinafter "YJWTP"), which the County has operated since 1955, each day produces approximately 1,350 tons of liquid sewage sludge, which is dumped into the ocean. Such dumping will, under the terms of the statute, become unlawful unless discontinued on or before December 31, 1991. Under the consent decree, the County must, by that date, construct a "dewatering" facility [2] capable of transforming the liquid sewage sludge into "sludge cake," which can be disposed of on land.

In June 1989, the County hired Blasland & Bouck Engineers, P.C., an engineering consulting firm, to evaluate various methods for transporting the liquid sewage sludge from the YJWTP to such a dewatering facility and to identify possible sites for that facility. After assessing the relative environmental risks, cost-effectiveness and feasibility of several means of transporting liquid sewage sludge, the engineers concluded that the sludge might be transported by pipeline or by barge, but that the farther the liquid sewage sludge was transported the greater the risk of an accidental spill. With this in mind, the engineers identified twenty possible sites and ranked them according to the following criteria: (1) distance the liquid sewage sludge would have to be transported, (2) distance to the nearest park, recreational area, cultural or archeological resource, (3) distance to the nearest incompatible land use (*i.e.,* school, hospital, day-care facility), (4) impact on local traffic, (5) distance to the nearest residential area, (6) impact on ambient area quality, (7) impact on ambient air quality, (8) visual impact, (9) method by which the liquid sewage sludge would have to be transported, (10) site preparation required, (11) site topography and (12) whether the site was publicly or privately owned. Based on those criteria, they narrowed their investigation to what they determined were the eleven best sites.

The engineers then conducted a detailed comparative analysis of how the facility would be constructed and operated at each of those sites. Since the centrate generated at the dewatering facility would have to be further processed at the YJWTP, this stage of the engineers' analysis took into account, in addition to the above-listed criteria, how the centrate would be transported back to YJWTP. The report concluded that the best option would be to construct a 30' × 50' addition to the YJWTP. Among the advantages of building the facility as an addition to the YJWTP, rather than at a different site, were the elimination of environmental risks that would have accompanied transporting liquid sewage sludge from and centrate back to the YJWTP and the low relative cost of constructing and operating the facility there.

Pursuant to 6 NYCRR § 617.5(b), the engineers went on to complete a Full Environmental Assessment of the environmental effects of locating the dewatering facility at YJWTP. The YJWTP is situated alongside MetroNorth railroad tracks. Across the tracks lies a residential area known as Ludlow Park. As the Environmental Assessment noted, that area has been designated a "critical environmental area, Type I" pursuant to 6 NYCRR § 617.11. After examining any effects the proposed facility would have on land, water, air, plant and animal life, agricultural,

1. *United States v. County of Westchester,* No. 89 Civ. 5274 (WK), September 6, 1989.

2. A "dewatering" facility uses centrifuges to extract water from liquid sewage sludge. The resulting "dewatered" sludge is known as "sludge cake." The contaminated water extracted is known as "centrate."

aesthetic, historical and archeological resources, recreational areas, transportation, energy, noise, odor, public health and the growth and character of the surrounding neighborhood, the engineers concluded that it would "not have a significant impact on the environment" and recommended that the County issue, pursuant to E.C.L. § 8–0109, a negative declaration stating that no environmental impact statement was called for.

On January 17, 1990, the engineers' study, the Full Environmental Assessment, and supporting documentation were submitted to the Westchester County Board of Legislators. On January 29, the Board's Committee on Budget and Appropriations conducted an open hearing, at which one of the consulting engineers discussed the study and answered the Committee's questions. The next day, the full Board held another open hearing. Present were thirteen of the seventeen members of the Board and approximately 100 residents and representatives of the media. At that hearing, the consulting engineer described the procedures used and recommendations made in the study. The Board also heard comments from some of the residents.[3]

On February 1, the Committee recommended to the Board that it find that the proposed facility would not have a significant effect on the environment and issue a negative declaration. The Committee report stated that its recommendation was based on, *inter alia,* information gathered in the engineers' study, the Full Environmental Assessment, the hearings and a review of the criteria listed in NYCRR § 617.11.

On February 5, the Board issued a resolution reciting that "the County must now proceed with the preparations for implementing a dewatering facility, while it simultaneously investigates substitute methods, in order to meet the milestone deadlines set forth in the consent decree and avoid monetary penalties that could be imposed for failure to meet those deadlines" and determining that, based on its review of the engineers' study, the Environmental Assessment and "all other relevant supporting documentation," a negative declaration should be issued.

On March 22, 1990, a group of Ludlow Park residents opposed to further development of the YJWTP site, the mayor of the City of Yonkers and the state assemblyman for the Ludlow Park area commenced this Article 78 proceeding in the Supreme Court of New York, County of Westchester, seeking to reverse the Board's determination. Respondents removed to this court, where the action was deemed related to the one in which the consent decree had been filed.

---

**3.** On the basis of a resident's observations at the meeting, petitioners assert that several of the Board members declared that they had not reviewed the engineers' report or the Full Environmental Assessment. Even if such an assertion were relevant to our review, we would conclude, based on the following exchange at oral argument, that the particular assertion here put forward is too flimsy to credit.

MR. ZURHELLEN [For petitioners]: ... [T]here was a meeting in our neighborhood among I think all the members or most of the members of the committee and this person, Mr. Feinstein, asked them whether they had even read the two books worth of documents that were submitted by county, and only two of the fourteen or fifteen people there said they had. The others did not.
THE COURT: Did the others say they hadn't or just made no answer?
(Pause)
THE COURT: Off the record.

(Discussion off the record) [with Mr. Feinstein]
THE COURT: We will put on the record that the gentleman in the audience said he was there at the meeting and most of them just kind of shook their heads, I couldn't make out whether they were annoyed at the question or answering the question, at least from his view.
MR. ZURHELLEN: I am advised by my client not only here but beforehand that there was an indication by the other members that they had not read the thing, whether it was a no or a shaking of the head, but Mr. Feinstein confirmed to me, the person who did the affidavit, that there was an indication of a negative.
THE COURT: Beauty is in the eye of the beholder and if you are going to a meeting expecting to be annoyed at what you see, you will get annoyed by what you see.
MR. ZURHELLEN: Could be.
Transcript of Oral Argument, May 30, 1990 at 15–16.

On May 10, 1990, we determined to exercise jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651.

### DISCUSSION

■ Under SEQRA, respondents were required to determine whether constructing a dewatering facility at YJWTP would have a "significant effect" on the environment and, if they so determined, to cause an environmental impact statement to be prepared. 6 NYCRR 617.1(c). In this Article 78 proceeding, we review respondents' determination that no such statement was required to decide whether or not it "was made in violation of lawful procedure, was affected by an error of law or was arbitrary or capricious or an abuse of discretion...." C.P.L.R. § 7803(3); *Pell v. Board of Education* (1974) 34 N.Y.2d 222, 230–32, 356 N.Y.S.2d 833, 839–40, 313 N.E.2d 321; *Colton v. Berman* (1967) 21 N.Y.2d 322, 329, 287 N.Y.S.2d 647, 651, 234 N.E.2d 679. We are required to conclude that the determination was proper if, in making it, respondents identified all areas of concern, took a "hard look" at the issues involved, and made a "reasoned elaboration" for the basis of their finding that the facility would have no significant environmental effects. *Jackson v. New York State Urban Development Corp.* (1986) 67 N.Y.2d 400, 417, 503 N.Y.S.2d 298, 305, 494 N.E.2d 429. Our role is not "to weigh the desirability of any action or choose among alternatives, but to assure that [respondents have] satisfied SEQRA, procedurally and substantively." *Id.*

Petitioners make four principal arguments against the respondents' determination. They contend that the Board (1) improperly based its findings on the study and the Full Environmental Assessment rather than on reasons expressly enumerated in its resolution; (2) impermissibly took into account the deadlines established in the consent decree; (3) failed adequately to consider the effect of any additional traffic required to remove the sludge cake from the facility; and (4) did not give due deference to the fact that the Ludlow Park area

had been deemed "Type I." We find these arguments to be without merit.

■ We follow *Stewart Park and Reserve Coalition v. New York State Department of Transportation* (3d Dept.1990), 157 A.D.2d 1, 555 N.Y.S.2d 481, 484 in concluding that the Board's basing its resolution on the recommendations in the report and Environmental Assessment was entirely proper under *Jackson, supra,* in the absence of any indication that reliance on the engineering consultants was unreasonable.

■ We also see nothing improper in the resolution's recitation of the fact that the County, under the terms of the consent decree, was bound to meet certain deadlines. The Board, of course, could hardly have made its decision to construct a dewatering facility without reference to that fact. The circumstance that, as petitioners insinuate, the deadlines in the consent decree might conceivably have provided respondents with a motive for not complying with the applicable legal standards is simply a red herring; the issue to be determined is whether or not they complied, not why they might not have complied.

■ Nor can we say that respondents failed to identify and take a hard look at the traffic issue. To the contrary, the Full Environment Assessment supported its conclusion that transporting the sludge cake from the facility would not result in the generation of traffic significantly above current levels with the following discussion:

> The only traffic generated by the operation of the proposed facility will result from the transportation of the dewatered sludge to its disposal location and employees going to work and leaving work. Approximately six trucks per day will be required for the transportation of dewatered sludge from the YJWTP to the disposal facility. Potential impacts to local traffic are expected to be insignificant based on the amount of traffic generated as a result of two new employees

and five additional truck [sic] entering and leaving the YJWTP per day (Part 3, p. 11).

Petitioners insist that, by their calculations, a total of ten or twelve trucks—rather than five—will be required. Even if petitioners should turn out to have been correct in this prediction, it would not follow that the Board had arrived at its contrary determination, based on the engineers' study and the Full Environmental Assessment, arbitrarily, capriciously or in an abuse of discretion.

█ Finally, we note that the Ludlow Park area's designation as Type I, which was specifically noted in the Full Environmental Assessment and the negative declaration, did not command a determination that an environmental impact statement was required; it merely made such a determination "more likely." 6 NYCRR § 617.11; *Jaffe v. RCI Corp.* (3d Dept. 1986) 119 A.D.2d 854, 500 N.Y.S.2d 427, 429. Where, as here, the County followed the appropriate procedural requirements for a Type I area, "the issue distills to whether its conclusion that the proposed project would have no significant impact on the environment is a rational one which is supported by the record." *Id., citing Matter of Inland Vale Farm Co. v. Stergianopoulos* (1985) 65 N.Y.2d 718, 492 N.Y.S.2d 7, 481 N.E.2d 547. Based on our examination of the record, we find that it is.

### CONCLUSION

We deny the petition.

SO ORDERED.